IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                                No:  2:17-cr-1915-KG


LARRY EDUARDO RIVERO,

     Defendant.


## PROPOSED FINDINGS OF FACT AND RECOMMENDED DISPOSITION

## OF DEFENDANT'S MOTION TO SUPPRESS

**THIS MATTER** is before the Court upon Defendant Larry Edwardo Rivero's Motion to

Suppress ("Motion"). [Doc. 31].   In accordance with 28 U.S.C. §§ 636(b)(1)(B) and (b)(3),

United States District Judge Kenneth J. Gonzales referred the Motion to the undersigned to

conduct hearings, if warranted, and to perform any legal analysis required to recommend an

ultimate disposition. [Doc. 37].  Having reviewed the record, the parties' briefings, relevant case

law, and the testimony and exhibits presented at the September 27, 2017 evidentiary hearing, the

undersigned recommends, for the reasons set forth below, that the Motion be **DENIED**.


## PROCEDURAL BACKGROUND

Mr. Rivero was arrested on May 2, 2017 and charged with a violation of 8 U.S.C.

§1324(a)(1)(A)(v)(I), Conspiracy to Transport Illegal Aliens.   On May 4, 2017, Mr. Rivero

appeared for initial appearance and, on May 5, 2017, he waived his preliminary hearing. This

matter went before the Grand Jury and Mr. Rivero was indicted on July 19, 2017, on one count

of Conspiracy to Transport Illegal Aliens, in violation of 8 U.S.C. §1324(a)(1)(A)(v)(I), and one

count of Transporting Illegal Aliens and Aiding and Abetting, in violation of 8 U.S.C.

§1324(a)(1)(A)(ii), (a)(1)(b)(ii). [Doc. 25]. Mr. Rivero filed the Motion on July 28, 2017.

[Doc. 31]. The United States filed its response to the Motion on August 11, 2017. [Doc. 34].

Mr. Rivero did not file a reply. On August 21, 2017, a hearing on the Motion was set for

September 14, 2017, before United States District Judge Kenneth J. Gonzales. [Doc. 35]. On

August 23, 2017, Judge Gonzales ordered that the hearing be vacated[Doc. 36], and he referred

the Motion to the undersigned to conduct hearings, if warranted, and to perform any legal

analysis required to recommend an ultimate disposition. [Doc. 37].

An evidentiary hearing was held on September 27, 2017, at which counsel for both

parties, along with Mr. Rivero, were present. Both the Government and counsel for Mr. Rivero

presented evidence and oral argument concerning the Motion.

### MR. RIVERO'S CONTENTIONS

Mr. Rivero challenges the roving patrol stop of his vehicle by United States Border Patrol

Agent Edgar Tagle ("Agent Tagle") on New Mexico State Road 9 ("State Road 9") in Luna

County, New Mexico on May 2, 2017 at approximately 4:30 p.m. Mr. Rivero asserts that Agent

Tagle did not have a reasonable suspicion to believe that Mr. Rivero was transporting

undocumented immigrants or any other contraband, and so was not justified in making the stop.

Mr. Rivero urges the Court to suppress all evidence generated from the stop.

In connection with his argument that evidence gained by the Government as a result of

the stop should be suppressed, Mr. Rivero challenges much of the evidence upon which the

Government relies in support of the stop. Mr. Rivero contends that the fact that he was driving

on State Road 9 is entitled to little, if any, weight. Mr. Rivero argues that the fact that his vehicle was registered at an address in Las Cruces, Dona Ana County, New Mexico adds nothing to the reasonable suspicion analysis. Mr. Rivero further contends that since his vehicle was registered in Las Cruces, Dona Ana County, New Mexico, and he was driving in adjacent Luna County on a road that traverses both counties when he was stopped, the fact that he was driving his vehicle in a westerly direction on State Road 9 between the New Mexico communities of Santa Teresa and Columbus is entitled to no weight at all. Mr. Rivero further argues that Agent Tagle's premise that Mr. Rivero was driving on State Road 9 for the purpose of avoiding a fixed checkpoint located on Interstate 10 west of Las Cruces is a hunch, unsupported by evidence. Mr. Rivero also argues that the fact that he did not look at or waive to Agent Tagle when passing the agent's vehicle, and the fact that Agent Javier Murillo, the first United States Border Patrol Agent who saw Mr. Rivero's vehicle, saw only one person in the vehicle while Agent Tagle saw two people, add nothing to the analysis. [Doc. 31].

## THE GOVERNMENT'S CONTENTIONS

The Government counters Mr. Rivero's argument by contending that based upon the totality of the circumstances and a consideration of the factors enunciated in *United States v. Brignoni-Ponce,* 422 U.S. 873 (1975), Agent Tagle clearly had reasonable suspicion to stop Mr. Rivero's vehicle to further investigate the agent's suspicions. First, in addressing the *Brignoni-Ponce* factors, the Government states that State Road 9 originates in Santa Teresa, New Mexico and runs west along the U.S./Mexico border through a sparsely populated area of New Mexico to the Village of Columbus, New Mexico, and that State Road 9 is known to Border Patrol Agents as a smuggling route. Next, the Government points out the close proximity to the U.S./Mexico border where the stop was made. Next, the Government addresses the normal traffic patterns in

the area where the stop occurred, and points out that traffic tends to be local.   In addition, the Government contends that Mr. Rivero's automobile was unusually clean when compared with local traffic.  Next, the Government contends that Agent Tagle learned that Mr. Rivero's vehicle was registered to an individual with a Las Cruces address, raising further suspicion.

Next, the Government addressed the previous experience Agents Murillo, Velarde, and Tagle have had with illegal alien traffic.  The Government points out that Mr. Rivero's vehicle was traversing State Road 9 around the time of the agents' shift change.  In connection with information that the Border Patrol Agents might have concerning illegal border crossings in the area, the Government then points out that alien smuggling is a constant and common occurrence along State Road 9, and that many of the vehicles operated by the alien smugglers apprehended on or near State Road 9 are registered to Las Cruces, New Mexico addresses.

The Government then addresses Mr. Rivero's behavior as the driver of his vehicle, and makes several contentions.  First, the Government contends that the first United States Border Patrol Agent to encounter Mr. Rivero's vehicle on the date and at the  time in question was Agent Murillo.  The Government explains that Mr. Rivero was driving in a westerly direction along State Road 9 when he encountered Agent Murillo's marked Border Patrol Unit parked near mile marker 104.  Agent Murillo noticed that Mr. Rivero applied his brakes in an erratic manner, appeared extremely stiff at the wheel of his vehicle and did not acknowledge Agent Murillo when he drove past Agent Murillo's vehicle.  The Government also contends that Agent Tagle considered Mr. Rivero's origination point to be Las Cruces, Mr. Rivero's immediate destination to be Columbus, New Mexico, and considered it suspicious that Mr. Rivero would choose to take the much longer route from Las Cruces, to Santa Teresa, New Mexico, and then west along State Road 9 to Columbus, rather than the shorter route on a far superior road west from Las Cruces on

Interstate 10 to Deming, New Mexico, and then south to Columbus. The Government also points out that there is a United States Border Patrol check-point on Interstate 10 west of Las Cruces, and that the State Road 9 route being driven by Mr. Rivero permitted him to avoid that check point in his westerly travel from Las Cruces. Finally, the Government contends that alien smugglers often use high capacity vehicles to transport illegal aliens, and that the agents considered Mr. Rivero's blue Dodge sport utility vehicle (the "SUV") to be a high capacity vehicle.

In addition to the contentions referenced above addressing the *Brignoni-Ponce* factors, the Government makes an additional factual contention, and argues that a totality of the circumstances demonstrates that Agent Tagle had a reasonable suspicion to believe that Mr. Rivero was engaged in illegal activity. The Government points out that when Agent Murillo saw Mr. Rivero's vehicle traveling west on State Road 9 at mile marker 104, there was only one person observable in the vehicle. Next, when Mr. Rivero's vehicle encountered Agent Tagle further west on State Road 9 at mile marker 96, there were at least two people observable in Mr. Rivero's vehicle. Based upon that information, the Government contends that the Border Patrol Agents thought that either the passenger in Mr. Rivero's vehicle had been hiding from view when passing Agent Murillo at mile marker 104, or that Mr. Rivero had stopped and picked a person up along State Road 9 between mile marker 104 and mile marker 96.

## PROPOSED FINDINGS OF FACT

On September 27, 2017, the Court held an evidentiary hearing. The Government called three witnesses (Border Patrol Agents Javier Murillo, Luis Velarde and Edgar Tagle) to testify and introduced four exhibits. [*See* Doc. 45]. Mr. Rivero called private investigator Gilbert Nieto

to testify and introduced one exhibit. *See id.* The Court proposes the following factual findings be made based on the testimony of the four witnesses who testified and the exhibits that were introduced. Because no finalized transcript has been prepared, the Court does not cite to one. Unless more specifically explained herein, the Court has resolved any disputes in the testimony consistent with the following findings.

1. Border Patrol Agents Javier Murillo, Luis Velarde and Edgar Tagle each testified during the hearing on the Motion. Based on the agents' demeanor, attention to detail, and the content of their testimony, I found each agent to be a credible witness.

2. On May 2, 2017 at approximately 4:30 p.m. MDT, Agent Murillo observed the SUV traveling westbound on State Road 9 near mile marker 104.

3. The United States Border Patrol considers vehicles such as the SUV to be "high capacity" vehicles, which is to say that the vehicle is capable of transporting numerous people.

4. The United States Border Patrol Agents involved in observing, stopping and arresting Mr. Rivero on the date and time in question know that high capacity vehicles are often involved in illegal alien smuggling schemes because those vehicles may be used to transport numerous individuals at one time.

5. At the time and date that the United States Border Patrol Agents encountered the SUV, Agents Murillo and Tagle had each been United States Border Patrol Agents for nine years. Agent Murillo has been at the Deming Border Patrol Station for two years. Agent Murillo was assigned to the Lordsburg, New Mexico Border Patrol Station, approximately fifty-five miles west of Deming, for seven years before transferring to the Deming Border Patrol Station. Agent Tagle has been at the Deming

Border Patrol Station for the entirety of his career as an agent covering the geographical area at issue.

6.      Agent Murillo, who was sitting parked in his marked Border Patrol Unit near mile marker 104 on State Road 9, observed that the driver of the SUV applied the vehicle's brakes very forcefully as it approached Agent Murillo's location, so that the front of the SUV dipped noticeably.  Agent Murillo observed that when the SUV passed the location where his vehicle was parked, the driver appeared very stiff at the steering wheel.  Agent Murillo also observed that the driver of the SUV did not look at, waive to, or otherwise acknowledge seeing Agent Murillo or the United States Border Patrol vehicle sitting by the road.  Vehicle drivers from the local area typically waive to or otherwise acknowledge the Border Patrol Agents when their vehicles pass.

7.      Agent Murillo inferred from Mr. Rivero's very forceful application of the SUV's brakes at the initial encounter with Agent Murillo's marked United States Border Patrol unit that Mr. Rivero was concerned or alarmed with the presence of a United States Border Patrol Agent.

8.      Agent Murillo inferred from Mr. Rivero's conduct of not looking at or acknowledging the presence of the agent on the remote,  isolated road, and by looking straight ahead and appearing very stiff while driving, that Mr. Rivero  was tense, uneasy, or concerned by the presence of the agent and that he was not from the local area.

9.      Agent Murillo could only see one occupant, the driver, in the SUV.

10.      Agent Murillo noticed that in comparison to local traffic the SUV appeared abnormally clean. Agent Murillo did not recognize the SUV as a local vehicle.

11.     Agent Murillo was suspicious that the driver of the SUV might be engaged in illegal activity.

12.     Agent Murillo knew that Agent Luis Velarde and Agent Tagle were then positioned to the west on State Road 9, near mile marker 96.

13.     Agent Murillo advised United States Border Patrol Agent Luis Velarde via cellular telephone of his observations.  Agent Velarde, along with Agent Tagle, had stationed their marked Border Patrol Units near mile marker 96 about eight miles west of mile marker 104 on New  Mexico State Road 9.  The agents were sitting in their vehicles with the driver's doors facing each other, talking.  Agent Velarde's vehicle was pointing west and Agent Tagle's vehicle was pointing east.

14.     Agent Tagle was assigned to "sign cutting" duties in an area encompassing approximately ten miles on State Road 9.

15.     Agent Velarde informed Agent Tagle what Agent Murillo had just told Agent Velarde during the telephone call.   Agent Tagle, upon hearing the information relayed by Agent Murillo to Agent Velarde involving the SUV, positioned his marked Border Patrol Vehicle just off and parallel to New Mexico State Road 9 at mile marker 96 facing the east to watch the westbound vehicular traffic approach his location.

16.     Agent Tagle was suspicious about the SUV and its driver, based upon the information provided by Agent Murillo to Agent Velarde.

17.     Agent Tagle deployed a pair of binoculars to facilitate observation of westbound vehicular traffic.  At least three vehicles passed by Agent Tagle's position near mile marker 96 after Agent Murillo's telephone call.   As the vehicles approached,

Agent Tagle, utilizing his binoculars, could see the front seat passengers within the vehicles. None of those passing vehicles raised the agent's suspicion.

18.     A few minutes after Agent Murillo's call, the SUV traveling west on State Road 9  approached Agent Tagle's position. Using his binoculars, Agent Tagle saw a driver and a front seat passenger inside the SUV, rather than only one person as observed by Agent Murillo.

19.     Seeing two people in the SUV instead of one increased Agent Tagle's suspicion that the driver of the SUV was involved in an illegal alien smuggling scheme.

20.     The area along State Road 9 where Mr. Rivero was observed driving the SUV and where the traffic stop occurred is native desert rangeland.  Barbed wire fencing runs along either side of the road. There are no residences, businesses, schools, buildings or structures of any kind near the road anywhere between where Agent Murillo saw the SUV and where Agent Tagle encountered the SUV.

21.     State Road 9 is lightly travelled by vehicular traffic in the area between Santa Teresa and Columbus.

22.     Upon seeing two occupants in the SUV, Agent Tagle inferred that the SUV passenger not seen by Agent Murillo had either been bent over to avoid being seen by Agent Murillo, or had been picked up along State Road 9 between the location where Agent Murillo saw the SUV and the location where Agent Tagle encountered the SUV.

23.     The suspicions of the agents that the driver of the SUV might be involved in an illegal alien smuggling scheme were increased by the fact that each of the agents, including Agent Tagle, was aware that State Road 9 parallels the United States / Mexico International Border from Santa Teresa to Columbus and  is approximately two miles

north of the Mexican border in the area between mile markers 96 and 104. Additionally, Agent Tagle knew that State Road 9 is notorious for being used by smugglers to retrieve and transport illegal aliens and drugs.

24.     The agents involved in observing and conducting the traffic stop of the SUV were aware of the recent trend of illegal aliens walking over the U.S./Mexico border and walking north to State Road 9 in the area between mile marker 96 and mile marker 104, to be retrieved along State Road 9 by illegal alien smugglers in vehicles.

25.     When the SUV passed the point where Agent Tagle was parked along State Road 9, he proceeded to follow the SUV in his marked United States Border Patrol unit in a westerly direction along State Road 9.

26.     Agent Tagle ran a records check on the SUV. The records check came back to a blue Dodge Journey registered to owner Larry Rivero, the Defendant, showing a Las Cruces, New Mexico address.

27.     Recent trends in alien smuggling schemes interdicted in the Deming Border Patrol Station's area of responsibility have involved vehicles with registered owners having addresses in Las Cruces.

28.     Agent Tagle inferred that Mr. Rivero began his travel from his address in Las Cruces, since Mr. Rivero's car has a registered address in Las Cruces.

29.     The most direct route, shortest distance, and fastest route for a driver traveling west from Las Cruces to reach Columbus is for the traveler to travel west on Interstate 10 to Deming, and then south on New Mexico State Highway 11 ("State Road 11") to Columbus.

30.     State Road 9 is a paved highway with one lane of travel in each direction.

31. The roadway conditions on Interstate 10 are far better than the roadway conditions on State Road 9. The speed limit on Interstate 10 is 75 miles per hour, and the speed limit on State Road 9 is 65 miles per hour.

32. Westbound vehicles traveling on Interstate 10 from Las Cruces are subject to inspection at the United States Border Patrol permanent Immigration Checkpoint located on Interstate 10 near mile marker 120.

33. State Road 9 does not have a permanent Immigration Checkpoint.

34. There are no permanent Immigration Checkpoints located between Las Cruces and Santa Teresa.

35. There is a permanent Immigration Checkpoint located on State Road 11 north of Columbus.

36. A vehicle originating in Las Cruces traveling west on State Road 9 in the location where the SUV was stopped by the agents may indicate that the vehicle traveled from Las Cruces to Santa Teresa, and then in a westerly direction on State Road 9 to reach Columbus.

37. Vehicular travel on State Road 9 from Santa Teresa traveling west to or through Columbus, with an origination point of Las Cruces, permits the vehicle to circumvent the Interstate 10 permanent Immigration Checkpoint.

38. Agent Tagle considered the information provided by Agent Murillo concerning the SUV, the direction and route of travel of the SUV, the fact that the SUV was not from the local area, including that it was registered at an address in Las Cruces, the fact that he saw two occupants in the SUV initially where Agent Murillo had seen only one occupant, and the information he has gained about the area in question while

acting as an agent, including local trends concerning illegal alien smuggling, as factors in evaluating whether the driver of the SUV might be involved in an illegal alien smuggling scheme.

39.    Agent Tagle suspected that the passenger he saw in the SUV might be an illegal alien.

40.    Agent Tagle activated his United States Border Patrol unit's emergency equipment and conducted an immigration stop of the SUV near mile marker 92 on State Road 9.  As Agent Tagle approached the SUV, he noticed multiple human silhouettes in the second and rear passenger seats, indicating more than two individuals were located inside the SUV.

41.    Agent Tagle identified the driver of the SUV as Mr. Rivero.

42.    Agent Tagle asked Mr. Rivero to lower the vehicle windows so that the remaining occupants of the vehicle could be identified. The passengers of the SUV were identified by United States Border Patrol Agents to be Mexican Citizens without legal authorization to be in the United States.

43.    A total of five Mexican Nationals, illegally in the United States, were located in the SUV.

44.    The Government argued in its response to the Motion that Mr. Rivero was passing by the area between mile markers 104 and 96 on State Road 9 near the shift change time for the United States Border Patrol, and that smugglers often time their movement to coincide with those shift changes.  No evidence was introduced concerning shift changes.

45.     Mr. Rivero called Mr. Gilbert Nieto to testify at the hearing on the Motion. Mr. Nieto is a criminal investigator working for the Federal Public Defender's Office. Based on his demeanor, attention to detail, and the content of his testimony, the Court found Mr. Nieto to be a credible witness. Mr. Nieto testified concerning driving on State Road 9 himself. Mr. Nieto testified about origination points, including El Paso, Texas, where a motorist driving west on State Road 9 might have begun the motorist's trip. Mr. Nieto also testified about possible destinations that a motorist driving west on State Road 9 might have, including Columbus, Hachita, Animas, or Rodeo, New Mexico, or Douglas, Bisbee or Tombstone, Arizona. Mr. Nieto was questioned about whether a motorist traveling on State Road 9 would have to pass through a permanent Immigration Checkpoint anywhere along the way. Mr. Nieto testified about a permanent Immigration Checkpoint located near Columbus. Initially, Mr. Nieto testified that the permanent Immigration Checkpoint was located somewhere on State Road 9. Later in his testimony, Mr. Nieto corrected himself and testified that the permanent Immigration Checkpoint he was referring to is actually located north of Columbus on State Road 11, rather than being located on State Road 9.

## ANALYSIS

The Fourth Amendment protects citizens from unreasonable searches and seizures by the government. *U.S. Const. amend. IV*. This protection extends to brief investigatory stops of persons or vehicles that fall short of traditional arrest. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). "[T]he Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *Id*. (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

Consistent with the Fourth Amendment's prohibition against unreasonable searches and seizures, "Border Patrol agents 'on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion' that those vehicles' occupants may be involved in criminal activity." *United States v. Cantu*, 87 F.3d 1118, 1121 (10th Cir. 1996) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975)). Reasonable suspicion does "not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.*"* *United States v. Arvizu*, 534 U.S. 266, 274 (2002), *overruled in part on other grounds by Davis v. Washington*, 547 U.S. 813 (2006). Rather, "reasonable suspicion represents a 'minimum level of objective justification.'" *United States v. Mendez*, 118 F.3d 1426, 1431 (10thCir. 1997) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). In evaluating the constitutionality of a roving patrol stop, a court must consider the totality of the circumstances "from the perspective of the reasonable officer, not the reasonable person." *United States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir. 2003) (*emphasis in original*). "Officers must be permitted 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *Id*. (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

In *United States v. Brignoni-Ponce*, the Supreme Court explained that any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area. 422 U.S. at 884. The Supreme Court provided a non-exhaustive list of circumstances that may give rise to reasonable suspicion:

> (1) [the] characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5)

information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

*United States v. Monsisvais*, 907 F.2d 987, 990 (citing *Brignoni-Ponce*, 422 U.S. at 884-85). When evaluating an officer's decision to stop a vehicle, a court may not engage in a "sort of divide-and-conquer analysis" by evaluating and rejecting each factor in isolation. *Arvizu*, 534 U.S. at 274; *United States v. Gandara-Salinas*, 327 F.3d 1127, 1130 (10th Cir. 2003). This is because factors that by themselves may be "consistent with innocent travel" may collectively amount to reasonable suspicion. *Arvizu*, 534 U.S. at 274-75 (quoting *Sokolow*, 490 U.S. at 9). Rather, "the totality of the circumstances-the whole picture-must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). "In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *Brignoni-Ponce*, 422 U.S. at 885.

In situations where law enforcement officers are working together on an investigation, a court should evaluate whether their collective knowledge satisfied the appropriate legal standard, whether it be reasonable suspicion or probable cause. *See United States v. Chavez*, 534 F.3d 1338, 1345-48 (10th Cir. 2008) (citing *United States v. Zamudio-Carrillo*, 499 F.3d 1206 (10th Cir. 2007)); *see also United States v. Wilkinson*, 633 F.3d 938, 941-43 (10th Cir. 2011). Under the "collective knowledge" doctrine, sometimes referred to as the "fellow officer rule" or "police team concept," an officer who stops a vehicle need not himself be in possession of every fact necessary to a finding of reasonable suspicion or probable cause so long as some officer in that particular police team has possession of the necessary facts. *See Chavez*, 534 F.3d at 1345-48.

The first *Brignoni-Ponce* factor to be considered in connection with the evaluation of whether Agent Tagle had a reasonable suspicion that the driver of the SUV, who turned out to be Mr. Rivero, was engaged in criminal activity is the characteristics of the area where the traffic stop occurred.  *Id.* at 884-885.  State Road 9 is a paved two lane highway, located north of and near the U.S./Mexico border.  State Road 9 provides an east-west route of travel from Santa Teresa to New Mexico Highway 80 which is located near the western New Mexico border.   The traffic on State Road 9 is light.  The area along State Road 9 where Mr. Rivero was observed driving the SUV and where the traffic stop occurred is native desert rangeland.  Barbed wire fencing runs along either side of the road.  There are no residences, businesses, schools, buildings or structures of any kind near the road anywhere between where Agent Murillo saw the SUV and where Agent Tagle encountered the SUV.  The area is isolated and sparsely populated. There are no permanent United States Border Patrol inspection stations located on State Road 9. Additionally, the area of State Road 9 where the traffic stop occurred is frequently used by illegal alien smugglers as a route to retrieve and transport illegal aliens.  The characteristics of the area are known to each of the agents, and factored into the agents' suspicion of the SUV and its driver.  The characteristics of the area support the agents' suspicions that the driver of the SUV might be involved in criminal activity.

The second *Brignoni-Ponce* factor is the proximity of the area to the border.  *Id.*  Agent Tagle was aware that State Road 9 parallels the United States / Mexico International Border from Santa Teresa, to Columbus.  Agent Tagle also knows that State Road 9 is approximately two miles north of the Mexican border in the area between mile markers 104 and 96.  The Court recognizes that highways near the border will carry law abiding travelers as well as those involved in criminal activity.  However, "proximity to the border may be considered as a factor

in the reasonable suspicion calculus." *United States v. Diaz-Juarez,* 299 F.3d 1138, 1142 (9th Cir. 2002). The area is isolated, sparsely populated cattle ranching country with no residences, businesses, schools, buildings, or other structures situated near State Road 9. State Road 9 is located very close to the U.S./Mexico border. The character of the area and proximity of State Road 9 to the border lends itself to use of State Road 9 by people retrieving and transporting illegal aliens. The close proximity to the border was appropriately considered by Agent Tagle in his assessment that the driver of the SUV might be involved in criminal activity. *See Hernandez-Lopez,* 761 F. Supp. 2d at 1195 ("The Tenth Circuit has . . . [provided] a rough guide of fifty miles as being sufficiently close to support reasonable suspicion.").

The third *Brignoni-Ponce* factor is the usual patterns of traffic on the particular road. State Road 9 is lightly traveled. Most of the vehicular traffic in the area tends to be local residents and ranchers. Agent Murillo noted that the SUV was unusually clean, unlike the local vehicles in the area, which are often dirty and dusty from driving on dirt roads. Agent Murillo did not recognize the SUV as a local vehicle. Agent Tagle learned that the SUV was registered to a Las Cruces address, so the agent knew the vehicle was not a local vehicle. State Road 9 where the traffic stop occurred is not the normal path of westbound vehicular traffic originating in Las Cruces. Most of the east/west vehicular traffic in southern New Mexico is on Interstate 10 between Las Cruces and the western border of New Mexico. Hence, the agents thought it unusual for a traveler, such as Mr. Rivero, to have begun driving in Las Cruces, intent on traveling to some point west of Las Cruces, and to have routed himself so that he was traveling west on State Road 9 towards Columbus. The local patterns of traffic, when contrasted with the rational inferences Agent Tagle drew about Mr. Rivero's actions on the date and time in question, further support Agent Tagle's supposition that he had reasonable suspicion that the

driver of the SUV was engaging in criminal activity when the agent conducted the traffic stop of the SUV.

The fourth *Brignoni-Ponce* factor addresses the previous experience of the agents with alien traffic. *Id.* At the time of the arrest, Agents Murillo and Tagle had each been United States Border Patrol Agents for nine years. Agent Murillo has been at the Deming Border Patrol Station for two years. Agent Murillo had been assigned to the Lordsburg, New Mexico Border Patrol Station, 55 miles west of Deming, for seven years before transferring to the Deming Border Patrol Station. Agent Tagle has been at the Deming Border Patrol Station for the entirety of his career as an agent covering the geographical area at issue. *See Barron-Cabrera*, 119 F.3d at 1461 (finding that an officer's three and a half years of experience as a border patrol agent in the area satisfied the fourth prong of *Brignoni-Ponce* ). Agent Murillo and Agent Tagle both have extensive experience detecting and interdicting illegal alien smuggling in the geographic area where the traffic stop occurred.

The fifth *Brignoni-Ponce* factor addresses the information the agents might have had concerning recent border crossings in the area. *Id.* The agents involved in observing and conducting the traffic stop of the SUV were aware that State Road 9 parallels the United States / Mexico International Border from Santa Teresa to Columbus. In addition, the agents knew that State Road 9 is notorious for being used by smugglers to retrieve and transport illegal aliens and narcotics, and that State Road 9 is never more than approximately two miles north of the Mexican border between mile markers 104 and 96.

The agents were also aware of recent trends in illegal alien smuggling schemes implemented in the area. Recent trends with illegal alien smuggling there have involved vehicles

with registered owners having addresses in Las Cruces, as did the SUV driven by Mr. Rivero. In addition, recent trends there have involved illegal aliens walking over the U.S./Mexico border and walking north to State Road 9 in the area between mile marker 96 and mile marker 104, to be retrieved by illegal alien smugglers in vehicles. When Agent Tagle saw a passenger in the SUV, where Agent Murillo had seen only the driver minutes earlier, Agent Tagle's suspicions were increased. Agent Tagle drew the rational inference that the SUV passenger might have either been attempting to avoid being seen by Agent Murillo when the SUV went past Agent Murillo's vehicle, or that the passenger had walked north over the U.S./Mexico border and had been retrieved by the SUV driver somewhere between mile marker 104 and mile marker 96.

The sixth *Brignoni-Ponce* factor evaluates the driver's behavior, including any obvious attempts to evade officers. *Id.* at 885. Agent Murillo, who was sitting in his marked Border Patrol Unit near mile marker 104, observed that the driver of the SUV applied the vehicle's brakes very forcefully as it approached his location, to the extent that Agent Murillo could see the front end of the SUV dip closer to the roadway surface. Agent Murillo observed that when the SUV passed the location where Agent Murillo's vehicle was parked, the driver appeared very stiff at the steering wheel. Agent Murillo also observed that the driver of the SUV did not look at, waive to, or otherwise acknowledge seeing Agent Murillo[1] or the United States Border Patrol vehicle sitting by the road. Local drivers tend to waive to or otherwise acknowledge agents when they pass on the highway.

Agent Murillo rationally inferred from Mr. Rivero's forceful application of the SUV's brakes that Mr. Rivero was concerned or alarmed with the presence of a United States Border

---

[1] In his motion, Mr. Rivero names Agent Tagle as the officer he did not acknowledge. [Doc. No. 31, p. 5]. As the only evidence presented on this point related to Agent Murillo, the Court presumes that the reference to Agent Tagle was a typo and will proceed as such.

Patrol Agent.  Agent Murillo rationally inferred from Mr. Rivero's conduct of not looking at or acknowledging the presence of the agent on the remote,  isolated road, and by looking straight ahead and appearing very stiff while driving, that Mr. Rivero  was tense, uneasy, or concerned by the presence of the agent and that he was not from the local area.  *See* Arvizu, 534 U.S. at 275-76 (noting that driver's slowing down, stiffening of posture, and failure to acknowledge sighted law enforcement officer may be unusual on remote road).

Agent Velarde, along with Agent Tagle, had stationed their marked Border Patrol Units near mile marker 96 about eight miles west of mile marker 104 on New  Mexico State Road 9.  The agents were sitting in their marked Border Patrol Vehicles with the driver's doors facing each other, talking.  Agent Velarde's vehicle was pointing west and Agent Tagle's vehicle was pointing east.  Agent Murillo knew that Agent Velarde and Agent Tagle were then positioned to the west of him on State Road 9, near mile marker 96.  Agent Murillo advised Agent Velarde via cellular telephone of his observations.

 Agent Velarde relayed to Agent Tagle what Agent Murillo had just told Agent Velarde during the telephone call.  Agent Tagle, upon hearing the information relayed by Agent Murillo to Agent Velarde involving the SUV, positioned his vehicle just off and parallel to New Mexico State Road 9 at mile marker 96 facing the east, to watch the westbound vehicular traffic approach his location. Agent Tagle was suspicious about the SUV and its driver based upon the information provided by Agent Murillo to Agent Velarde.

Before the SUV approached Agent Tagle's position, the agents suspected that the SUV was not a local vehicle.  After the SUV passed Agent Tagle and the agent was following the SUV to the west on State Road 9, the agent ran the SUV's plates and learned that the SUV was

registered to Mr. Rivero at a Las Cruces address.  Accordingly, Agent Tagle knew that the SUV

was not a local vehicle and drew the rational  inference that the trip for the SUV driver had

originated in Las Cruces.   Agent Tagle was suspicious of the route chosen by the SUV driver.

The most direct  route of vehicle travel from Las Cruces to Columbus, or some other point

located west of Las Cruces, would be to drive directly to the west from Las Cruces on Interstate

10, rather than driving south from Las Cruces to Santa Teresa,[2] and then west on State Road 9 to

Columbus.  In addition, driving conditions on Interstate 10 are far superior to the driving

conditions found on State Road 9.  Furthermore, the speed limit is 75 miles per hour on Interstate

10 verses 65 miles per hour on State Road 9, permitting faster travel on Interstate 10.

     The agents also knew that westbound vehicles traveling on Interstate 10 from Las Cruces

are subject to inspection at the United States Border Patrol permanent Immigration Checkpoint

located on Interstate 10 near mile marker 120.  State Road 9, on the other hand, does not have a

permanent Immigration Checkpoint, nor is there a permanent Immigration Checkpoint located

between Las Cruces and Santa Teresa.  Vehicular travel on State Road 9 from Santa Teresa

traveling west to or through Columbus, with an origination point of Las Cruces, permits the

vehicle to circumvent the Interstate 10 Immigration Checkpoint.  The possibility that the SUV

was traveling on State Road 9 in a westerly direction, rather than traveling west on Interstate 10,

in order to avoid the permanent Immigration Checkpoint on Interstate 10  was a deduction made

by the agents,  and factored into Agent Tagle's decision to stop the SUV.

     Since Agent Tagle inferred that the SUV's route originated in Las Cruces, the agent also

surmised that if the destination for the SUV was somewhere to the west of Las Cruces other than

---

[2] The Court recognizes that Interstate 10 is considered to be an east-west route of travel.  The Court also recognizes that one traveling from Las Cruces to Santa Teresa might travel a portion of the distance on Interstate 10, and would be said by some to have traveled east on Interstate 10.  However, Santa Teresa is located due south of Las Cruces, so the Court has referred to the direction of travel from Las Cruces to Santa Teresa as south.

Columbus, then Mr. Rivero's choice of routes was even more suspicious because of the circuitous nature of the route and the additional mileage and travel time that the chosen route would have added to Mr. Rivero's travel. Regardless of whether Mr. Rivero's destination was Columbus, or some other destination west of Las Cruces, the agent's suspicions were heightened because Mr. Rivero's choice of route permitted him to avoid passing through a permanent Immigration Checkpoint. Agent Tagle and the other agents reasonably considered the direction of travel and route of travel of the SUV as factors in evaluating whether the driver of the SUV might be involved in an illegal alien smuggling scheme.

The seventh *Brignoni-Ponce* factor evaluates aspects of the vehicle involved in the traffic stop that might bear upon reasonable suspicion that the driver was engaged in illegal conduct. *Id.* Agents Murillo and Tagle were aware that illegal alien smugglers often utilize "high capacity vehicles" capable of transporting numerous individuals. Agents Murillo and Tagle considered the SUV to be a high capacity vehicle, lending to their suspicion that the driver of the SUV might be engaged in illegal alien smuggling. Agent Murillo also noticed that the SUV was unusually clean compared to local vehicles, and suspected that the SUV was not a local vehicle.

The eighth *Brignoni-Ponce* factor enumerated by the Supreme Court is whether the vehicle appears to be heavily loaded. No evidence was introduced concerning whether the SUV appeared to be heavily loaded.

In *Brignoni-Ponce*, the Supreme Court explained that any number of factors, in addition to those factors specifically enumerated in the opinion, may be taken into account in deciding whether there is reasonable suspicion to conduct a traffic stop of a car in the border area. 422 U.S. at 884. When the SUV passed by Agent Murillo at mile marker 104, he could only see one

occupant in the SUV: the driver. When the SUV approached Agent Tagle a few minutes later and approximately eight miles further west along State Road 9, Agent Tagle, with the aid of his binoculars, could see the driver of the SUV and a front seat passenger. Seeing at least two people in the SUV instead of one increased Agent Tagle's suspicion that the driver of the SUV was involved in an illegal alien smuggling scheme. Agent Tagle suspected that the SUV passenger he saw might be an illegal alien. Agent Tagle drew the rational inference that the SUV passenger not seen by Agent Murillo had either been bent over to avoid being seen by Agent Murillo, or had been picked up along State Road 9 between the location where Agent Murillo saw the SUV and the location where Agent Tagle encountered the SUV. Either inference added to the agent's reasonable suspicion that Mr. Rivero was engaged in illegal activity at the time Agent Tagle initiated the traffic stop of the SUV.

Mr. Rivero notes many of the facts relied upon by the Government and attempts to discount those facts by discussing them in isolation and pointing out innocent explanations for each. For example, Mr. Rivero attempts to dismiss the sighting of the passenger in the front seat of the SUV by Agent Tagle as insignificant, arguing that Agent Murillo might have simply missed seeing the SUV passenger, or that the passenger might have been bending down for an innocent reason when the SUV passed Agent Murillo. Similarly, Mr. Rivero argues that there are plausible, legitimate reasons that he might have been driving on State Road 9 when he was stopped by Agent Tagle. "A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *United States v. Arvizu* at 277 (citing *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)). The agents appropriately drew on their experience and specialized training and made inferences from and deductions about the cumulative information available to them. *United States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir. 2003).

Evaluated in isolation and in a vacuum, each of the individual facts relied upon by Agent Tagle in determining that he had a reasonable suspicion to believe that the driver of the SUV was involved in criminal activity might be insufficient. However, while "any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel...taken together they amount to reasonable suspicion." *Quintana-Garcia*, 343 F.3d at 1274 (internal quotations omitted).

The Government bears the burden to prove by a preponderance of the evidence that the vehicle stop was grounded in a reasonable and articulable suspicion that illegal activity was afoot. *See, e.g.*, *United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir. 2012) (citing *United States v. Kitchell*, 653 F.3d 1206, 1216 (10th Cir. 2011)). The facts known by Agent Tagle, as proven by the Government by a preponderance of the evidence during the hearing, together with the rational inferences the agents drew from those facts, demonstrate that Agent Tagle had a reasonable and articulable suspicion that criminal activity was afoot. Therefore, under the totality of the circumstances, Agent Tagle's stop of the SUV was supported by reasonable suspicion.

## RECOMMENDED DISPOSITION

**The Court recommends that the Proposed Findings of Fact contained herein be adopted and that, based upon those Findings of Fact and the applicable law, Larry Eduardo Rivero's Motion to Suppress [Doc. 31] be DENIED.**

**KEVIN R. SWEAZEA**
**UNITED STATES MAGISTRATE JUDGE**

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1)(c). Any request for an extension of time must be filed in writing no later than seven days from the date of this filing. A party must file any objections with the Clerk of the District Court within the fourteen-day period, together with any period for which an order is entered granting an extension of time, if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.